IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

04 JUN -3 AM 8: 51

U.S. DISTRICT COURT
N.D. OF ALABAMA

ARLENE R. ERSKINE,                    )
                                      )
              Plaintiff               )
                                      )
     vs.                              )        CASE NO. CV01-HGD-2646-NE
                                      )
LES BROWNLEE, Secretary of the Army,  )
                                      )        **ENTERED**
              Defendant               )
                                               JUN 0 3 2004

                                               UNITED STATES DISTRICT COURT
                                               NORTHERN DISTRICT OF ALABAMA

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant [Doc. #14]. This matter is before the undersigned United States Magistrate Judge based upon the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) and Rule 73, Fed.R.Civ.P. Plaintiff, Arlene R. Erskine, is an African-American and a federal civilian employee of the Department of the Army's U.S. Aviation and Missile Command (AMCOM) at Redstone Arsenal, Alabama. She alleges that she is the victim of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

Erskine alleges that she was subjected to discrimination when (1) she was not selected for a GS-09 temporary promotion; (2) she was denied training in a program that led to Microsoft certification in a particular computer-related area; and (3) she was denied funds

29

to attend a Blacks in Government conference in August 1998.  Erskine also alleges retaliation and reprisal when, because of her complaints to the Redstone Arsenal Equal Employment Opportunity office, (1) she was awarded a lower performance rating in March 1999 than those she previously had received, and (2) she was not selected to attend the Blacks in Government conference in 1999.

**STANDARD OF REVIEW**

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.  A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to

2

interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). However, "[a] court need not permit a case to go to a jury when the inferences that are drawn from the evidence and upon which the non-movant relies are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 592, 106 S.Ct. at 1359). It is, therefore, under this standard that the court must determine whether plaintiff can meet her burden of

coming forward with sufficient evidence as to each material element of her claim sufficient to permit a reasonable jury to find in her favor.

### FACTUAL BACKGROUND

During the events which form the basis of this litigation, Erskine was a Senior Telecommunications Equipment Operator, employed at a pay grade of GS-08. She was assigned to the Telecommunications Center, Systems Operation Division, in the Corporate Information Center (CIC) at AMCOM, located at Redstone Arsenal, Alabama. Erskine's direct supervisor was Paul Henderson until September 1996, when Henderson resigned. Henderson's supervisor was Jackie Elkins, Division Chief of Information Services. Since Henderson's resignation, Elkins has served as Erskine's direct supervisor. Brian Taylor, CIC Director of Operations, was Elkins' supervisor, and James Ivey, CIC Director, was Taylor's supervisor.

**The Temporary GS-09 Team Leader Position Promotion**

In 1996, following the resignation of Paul Henderson, Elkins decided to create a new Team Leader position in the Systems Operations Division. Deciding that there was no employee in the department who was ready to take that position, Elkins decided to temporarily assign, or "detail," an employee to that position for 180 days. Such a move is statutorily authorized under 5 U.S.C. § 3341 and 5 C.F.R. § 300.301. The employee selected for this task would handle many of the administrative tasks previously handled by

4

Henderson. The only two employees in the department who were eligible for the temporary Team Leader position were Erskine and Deborah Gilbert, a white female who was also a GS-08 Telecommunications Operator. In September 1996, Elkins selected Gilbert as a GS-09 Team Leader.

According to the testimony of Elkins, he selected Gilbert because he believed that she was the one best qualified for the position. He considered that she often had volunteered to help other employees, had "served on some . . . projects or teams where they tested equipment and stuff for telecommunications," and had "volunteered to go to other sites to help develop new systems, do field testing . . . [and] performed very well." In addition, he reviewed Erskine's and Gilbert's files and determined that Gilbert was well known in the Telecommunications community, had a good working relationship and points of contact with people working at other installations throughout the United States, and had a good understanding of the overall mission of the Telecommunications division. [Defendant's Exhibit (DEX) 2, at 99-100; DEX 3 at 321-22]. He did not find similar information in Erskine's file. [DEX 3 at 321-22]. Elkins also reviewed both of their educational backgrounds and training and recalled that Gilbert had more relevant training than Erskine. [*Id.* at 325].

According to Elkins, while Gilbert served in the temporary position, her performance was "outstanding." [DEX 2 at 149]. Erskine never received the opportunity to demonstrate her competence in this position [*id.*], even though Henderson advised her before he left that

she and Gilbert would alternate in the team leader position.  [*Id.* at 88].  According to

Erskine, on one occasion in the past when a similar situation occurred, the position was

rotated between the candidates.  [Plaintiff's Exhibit (PEX) 2 at 56-57].

In July 1997, Erskine filed an EEO complaint alleging that she had been discriminated

against because she had not been given the opportunity to hold the team leader position.

(DEX 2 at 88-89].  In January 1998, Erskine agreed to a settlement of this dispute.  In the

settlement agreement, AMCOM agreed to detail Erskine to a day-shift position wherein she

would learn various new skills during on-the-job training.  She also agreed to, and received,

a 120-day training assignment at Ft. Huachuca, Arizona, to receive training in the Defense

Message System (DMS) program.  [DEX 3 at 139-44].

In December 1997, Elkins "non-competitively" promoted Gilbert to a 180-day

temporary GS-09 Team Leader position.  [DEX 2 at 104].  He did so based on her

performance since receiving the earlier temporary assignment.  Erskine did not learn about

this promotion until April 1998. On June 2, 1998, she initiated contact with the EEOC office

to assert that she again was subjected to race discrimination by not being selected for the

temporary promotion.

**The Microsoft Certification Program**

Erskine sought permission to attend a Microsoft Certification System Engineer

(MSCE) Course.  This course was divided into three consecutive segments scheduled for

October and November of 1998 and January of 1999.  [*Id.* at 126].  To progress through the

6

training to the point where one could actually pass the certification test, all three segments were necessary. Thus, it was decided that this training would be a "package deal." The persons selected for the October class were selected for all three classes. [*Id.* at 162]. To obtain the training, the persons selected were required to be (1) currently skilled in System Administration, (2) skilled in accessing the root directory area of the computer system, (3) skilled in using Windows NT and the Unix Operating System, and (4) working with new systems that were in that work group (the "CSP"). [*Id.* at 127, 129, 138, 158-59, 164; DEX 1, Erskine Depo., at 49].

Erskine did not have the requisite qualifications to be selected for the training. [DEX 2 at 164]. She had no root level access experience and, by her own admission, had no training or experience with Windows NT or Unix by the time the first course began in October 1998. [*Id.* at 129-30, 132; DEX 1, Erskine Depo., at 50, 56]. She also had no experience as a system administrator. [DEX 3 at 92]. Erskine also was not selected because the job she was performing at that time did not require the skills obtained through these courses. [*Id.* at 380-83, 390].

## 1998 Blacks in Government (BIG) Conference

On July 23, 1998, Erskine submitted a request to Elkins for funding to attend a five-day Blacks in Government (BIG) conference the following month in Washington, D.C. [DEX 4, Erskine Memorandum dated July 23, 1998]. The cost of the conference was approximately $1,300. [DEX 3 at 125]. Elkins forwarded the request to Brian Taylor, the

7

Director of Operations for CIC. [DEX 2 at 28-30]. Taylor testified that he believed that AMCOM was required to send a representative to this conference. [*Id.* at 29-30]. However, he learned that a personnel management specialist, James Foster, already was scheduled to attend as a representative from AMCOM. [*Id.*]. Taylor also determined that the training at the BIG conference was not "mission essential" to his department and funding was extremely tight; therefore, he disapproved Erskine's request. He agreed, however, to allow her to take administrative time off to attend the conference at her own expense (*i.e.*, Erskine would be paid and would not be charged leave while attending the conference). [*Id.* at 30]. Erskine has conceded that this conference was not mission essential. [DEX 3 at 35].

## 1999 Performance Evaluation

In her position as a Senior Telecommunications Operator, Erskine received annual performance evaluations. Her supervisor, Elkins, was responsible for completing the annual report. On March 11, 1998, her annual performance appraisal rated her as "Successful, Level 1" for the 1997-1998 time period. [DEX 10, Evaluation dated March 11, 1998].

During the next rating period, Erskine was moved, at her request and in settlement of her 1997 EO complaint, from a night-shift position to a day-shift detail so that she could receive on-the-job training on various new skills. [DEX 2 at 65-66]. This detail was a 180-day assignment. [DEX 3 at 140-41]. During February and March of 1998, Erskine attended a four-week training program at Ft. Huachuca, Arizona, on the Defense Message System (DMS). Upon returning from the DMS course, Erskine was assigned to work DMS

8

as a technical job requirement. [DEX 2 at 77]. However, she had a very difficult time with the program and eventually requested that she be reassigned to different duties "because of the stress." [*Id.* at 77-82; DEX 3 at 394]. In her next evaluation, Erskine received a rating of "Successful, Level 2" which is a step lower than her previous rating. [DEX 12, Evaluation dated March 2, 1999]. Elkins testified that the primary reason he rated Erskine lower in this evaluation was because of her problems handling the DMS program. [DEX 2 at 83-84]. Erskine does not dispute that she had a problem with the DMS program. However, she claims that it was because she had not received prerequisite training needed to perform that assignment. [DEX 2 at 82]. Elkins also testified that Erskine had several other performance-related problems throughout the 1998-1999 rating period, including "problems writing reports, gathering information to put in those reports, [and] getting them out on time." [*Id.* at 83].

**1999 Blacks in Government Conference**

On June 16, 1999, Erskine submitted a request to Elkins to attend the 1999 BIG conference in New Orleans, Louisiana. [DEX 6, Erskine E-mail to Elkins dated June 16, 1999]. The estimated cost of the five-day conference was approximately $1,300. [DEX 2 at 34]. Elkins forwarded this request to Taylor. Taylor believed that he was required to send a representative to this conference. [*Id.* at 44]. He met with Ferris Christian, the Director of the CIC Business Management Office (who controlled funding for CIC training programs), to determine who would be the best person to send to the conference. [*Id.* at 45-

46, 52]. Christian suggested Glenda Parker attend the conference because she was the Training Coordinator in charge of training programs for all of CIC. [*Id.* at 45, 212, 228]. On July 23, 1998, Taylor informed Elkins that Parker had been selected to attend the BIG conference. [DEX 8, Taylor E-mail to Elkins dated July 23, 1999]. On July 25, 1999, Taylor learned that Parker did not want to attend this conference. [DEX 2 at 48]. On or about July 27, 1999, Taylor went to James Ivey, Director of the CIC, to see what he should do. After checking with the Civilian Personnel Office, Ivey determined that it was not necessary to send a representative to the conference; and he informed Taylor of this fact. Because there was a shortage of funds for travel and training, Ivey decided that no one would attend the BIG conference. [*Id.* at 54, 57, 229; DEX 3 at 216; DEX 9, Ivey Memorandum dated July 27, 1999].

## DISCUSSION

There is no direct evidence of discrimination in this case. Therefore, the court must look at circumstantial evidence of discrimination. In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the

10

initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

In *McDonnell Douglas*, the United States Supreme Court held that a plaintiff who has alleged racial discrimination in hiring has the burden of producing evidence (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants. 411 U.S. at 802, 93 S.Ct. at 1824.

*McDonnell Douglas* was a hiring case, but courts have used variants of the four factors in the context of other types of discrimination claims. *See, e.g. Barber v. International Bhd. of Boilermakers*, 778 F.2d 750, 756 (11th Cir. 1985) (wage discrimination); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997) (failure to promote); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (same); *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989) (discriminatory disciplinary action). "The 'ultimate question' in a disparate treatment case is not whether the plaintiff established a *prima facie* case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) (quoting *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714-15, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983)).

### Non-Selection to Temporary GS-09 Position[1]

To establish a *prima facie* case of discriminatory failure to promote, Erskine must show that (1) she was in a protected group; (2) she was not given the promotion; (3) she was qualified for the position; and (4) someone outside of the protected group was given the position. *Standard*, 161 F.3d at 1333. Defendant concedes for purposes of this motion that Erskine can establish a *prima facie* case of discrimination. However, defendant states that there are legitimate, non-discriminatory reasons for her non-selection.

---

[1] The court notes that plaintiff's failure to receive the promotion to the temporary GS-09 position given to Gilbert in December 1997 was not the subject of the settlement agreed upon in January 1998. That agreement was the result of plaintiff's complaint that she was not rotated into the 180-day "detail" position which Gilbert received in September 1996. Plaintiff alleges that she was unaware that Gilbert had been promoted into the temporary GS-09 position until April of 1998, after the earlier settlement had occurred.

Defendant asserts that Gilbert was selected for this position over Erskine because Elkins believed that Gilbert was better qualified. The basis for this decision is set out above. In short, Elkins reviewed the files of each candidate and determined that Gilbert had more relevant training and had worked on various projects that tested telecommunications equipment whereas Erskine had no such experience. Elkins also considered the fact that Gilbert had good working relationships with others she would be dealing with in the position and knew points of contact in other Army facilities throughout the United States.

To satisfy the burden of production of a legitimate, non-discriminatory reason for a personnel action offered to rebut a *prima facie* showing of discrimination involving circumstantial evidence, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted); *Combs*, 106 F.3d at 1529. "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. Under this standard, defendant has established a legitimate, non-discriminatory reason for not promoting Erskine.

Plaintiff asserts that the evidence reflects that the proffered reasons were not the true reasons for the employment decision, that a discriminatory reason more likely motivated the

13

employer, and that the employer's proffered explanation is unworthy of credence. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff takes issue with some of defendant's stated reasons for Gilbert's selection, asserting that the fact that Gilbert was recommended for the position by Paul Henderson before he left the position is hearsay and that Henderson told her she would rotate with Gilbert in this position. According to Erskine, this was the "traditional manner" in which such situations were handled. She further asserts that Elkins' statement that Gilbert's performance in the position was "outstanding" was also hearsay and that Elkins had also opined that plaintiff "had the potential for career advancement" in her evaluation. Erskine also argues that, although she was given training after her July 1997 EEO complaint, she never was given the opportunity to use that training as a Team Leader. This is also proffered as evidence that Elkins' claim that he chose Gilbert based on her qualifications is pretextual.

None of the arguments advanced by plaintiff establish pretext by defendant or raise any factual issue as to pretext. Henderson's recommendation and Gilbert's performance evaluation are not hearsay, nor is Elkins' reliance thereon. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Fed.R.Evid. The documents here were not tendered to prove the particulars of their contents but to help establish that defendant was motivated, in good faith, to promote Gilbert rather than Erskine for reasons other than race. *See Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321, 1322-23 (11th Cir. 1982).

14

The fact that plaintiff was given training and then not given the opportunity to use it may be circumstantial evidence of discrimination, but defendant already has conceded that there is *prima facie* evidence of discrimination. It does not rebut defendant's claim that it chose Gilbert for the temporary team leader detail based on her qualifications and later chose to promote her to the temporary GS-09 position based on those qualifications and her performance as a team leader up to that point. Nor is it rebutted by plaintiff's assertion that she should have received the promotion because she had been a GS-08 Senior Operator longer than Gilbert. Even if Erskine had more seniority and had received training such that she was equally or better qualified than Gilbert, this evidence does not rebut defendant's asserted reason--that Elkins thought Gilbert to be the one best qualified for the job.

The law in the Eleventh Circuit is well-established that a plaintiff's opinion that he or she is as qualified as others is irrelevant. It is the employer's beliefs that are important, not the employee's. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, provided that the proffered reason is one that might motivate a reasonable employer. *Combs*, 106 F.3d at 1541-43. Federal courts

> do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

15

*Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck and Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)). "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory . . . ." *Moore*, 683 F.2d at 1323, n.4.

Plaintiff has proffered no evidence which reflects that Elkins' reason for choosing Gilbert over her is false. In *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000), the Eleventh Circuit clarified the evidentiary burden a plaintiff must meet in order to prove pretext with regard to qualifications. In a failure-to-promote case, a plaintiff must show that he or she was *substantially* more qualified than the person promoted. *Lee*, 226 F.3d at 1253-54. The court in *Lee* cited as an example *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277 (5th Cir. 1999), in which the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as to virtually jump off the page and slap you in the face." That court explained the phrase

> "jump off the page and slap [you] in the face" . . . should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

16

*Id.* at 280-81. The Eleventh Circuit in *Lee, supra,* also cited with approval the Tenth Circuit's language in *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321 (10th Cir.), *cert. denied,* 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999), wherein the court stated that "an employee's own opinions about his . . . qualifications [do not] give rise to a material factual dispute . . . . When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Id.* at 1330.

The evidence before the court regarding the qualifications of Erskine and Gilbert is not of such a character that it "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when she was promoted over the plaintiff. *Taylor v. Runyon,* 175 F.3d 861, 868 (11th Cir. 1999). Therefore, Erskine has failed to establish pretext with regard to this claim.

### Microsoft Certification Training

Defendant asserts that Erskine cannot establish a *prima facie* case of discrimination based upon her failure to be selected for the MSCE training because she did not suffer an adverse *personnel* action. For an employer to be guilty of discrimination against a non-federal employee under Title VII, an employee must have suffered an adverse *employment* action. To prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the

17

terms, conditions or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001).

For an employer to be culpable of discrimination against a federal employee, the employee must have suffered an adverse *personnel* action.[2]  This term is not precisely defined. However, defendant cites *Page v. Bolger*, 645 F.2d 227 (4th Cir.) (*en banc*), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), wherein the Fourth Circuit Court of Appeals stated that the term "personnel action" contemplated "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensation." *Id.* at 233.

The court finds that plaintiff has failed to show that her non-selection for the MSCE training was an adverse personnel action.  In *Bullock v. Widnall*, 953 F.Supp. 1461, 1473 (M.D.Ala.1996), *aff'd*, 149 F.3d 1196 (11th Cir. 1998), the United States District Court for

---

[2] Title 42 U.S.C. § 2000e-16(a) states, in pertinent part:

(a) **Discrimination prohibited.** All *personnel actions* affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, United States Code, in executive agencies as defined in section 105 of title 5, United States Code (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Printing Office, the General Accounting Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin. (Emphasis added).

the Middle District of Alabama analyzed whether non-selection for a training course constitutes adverse employment action. In *Bullock*, the plaintiff alleged that he was denied equal access to training courses in general and that, specifically, in retaliation for the plaintiff's EEO complaints, one of the plaintiff's subordinates was selected to attend a certain course which provided training in management supervision skills. The court found that the plaintiff had failed to show that his non-selection for the training course was an adverse employment action because the plaintiff did not demonstrate that his non-selection affected the terms or conditions of his employment. 953 F.Supp. at 1473. In other words, the plaintiff did not show that not attending the training course "would affect his salary, chances of promotion, ability to perform his job, etc." *Id.* Therefore, the court found that the plaintiff had failed to establish a *prima facie* case with regard to the training course. *Id.*

Applying the analysis in *Bullock* to the present case, the undersigned finds that Erskine similarly has failed to demonstrate that her non-selection for the four training courses resulted in any adverse employment action. Erskine has not carried her burden to show that her non-attendance at any of these courses affected or could affect her salary, chances of promotion, ability to perform her job, or any other aspect of her employment. The court therefore finds that Erskine fails to state a *prima facie* case for racially disparate treatment

19

in regard to the training classes because she has not proven the second element--that she has suffered an adverse employment action.[3]

Furthermore, at the time the first course was offered, plaintiff, by her own admission, did not have training or experience with Windows NT or the Unix Operating System which was necessary to the successful completion of the training. The courses were offered as a package deal because all three were necessary in order to be able to pass the certification test at the end. Thus, plaintiff was not qualified to take these courses when they first were offered. Since they were packaged together, she was not eligible for this training. The fact that she may have become qualified before all three courses had been completed is irrelevant.

In addition, defendant has asserted that this training was designed for persons who performed very specific technical functions relating to secure network and database management. Erskine was not doing this type of work and, thus, did not have an immediate need for the training. For this reason as well, defendant asserts Erskine was not selected for this training program.

Erskine has failed to rebut the legitimate, good faith reasons submitted by defendant for her non-selection for MCSE training. Therefore, she cannot prevail on this claim.

---

[3] Plaintiff asserts, without authority, that because defendant defended itself against this claim on the merits at the administrative level and did not assert any objection that the charges were not subject to relief even if true, it has waived the right to assert a claim here that plaintiff did not suffer an adverse employment action. This assertion is without merit. The authority cited by plaintiff is inapplicable. It deals with the government's failure to object to the timeliness of filing EEO complaints. The cases did not deal with failure to assert a defense on the merits of the claims.

**The 1998 Blacks in Government Conference**

Defendant alleges that, as with the MSCE training, plaintiff has failed to demonstrate that the failure to pay for plaintiff to attend this conference is an adverse personnel action. Plaintiff concedes that this claim is "difficult to sustain" under the *McDonnell Douglas* test. [Doc. #21, Plaintiff's Brief, at 13]. She acknowledges that she never was promised that she would be able to attend and that, ultimately, she was allowed to attend at her own expense without being charged annual leave. Therefore, she has failed to establish a *prima facie* case of discrimination regarding this event because she cannot show that this action was an adverse personnel action.

Furthermore, plaintiff has failed to rebut defendant's legitimate, good faith reasons asserted to justify its refusal to fund her attendance at this conference. Those reasons were that a personnel management specialist already was scheduled to attend this conference, that available funds were limited and that this course was not "mission essential" to the Telecommunications Division.[4]  Based on these reasons, a decision was made not to send anyone else to the conference. Plaintiff has failed to offer any evidence which indicates that these stated reasons are untrue or are a pretext for discrimination.

**The 1999 Performance Evaluation**

On March 11, 1999, Erskine was given a rating of "Successful Level 2" on her annual performance evaluation. This was one step lower than her 1998 performance evaluation in

---

[4] Plaintiff concedes that the BIG conference was not mission essential.  [DEX 3 at 35].

which she was rated "Successful, Level 1," the highest rating possible.  She alleges that this lower rating was given to her in retaliation for the EEO complaint she filed in July 1997.  In order for this event to qualify as a violation of Title VII, plaintiff must show that it constitutes an adverse employment action.  Defendant asserts that it is not.

The low performance evaluation, occurring in early 1999, is alleged to have been the result of an EEO complaint filed by the plaintiff in July 1997.  However, subsequent to the filing of her July 1997 complaint, Erskine was evaluated by Elkins in March 1998.  At that time, he gave her a performance evaluation of "Successful, Level 1."  Thus, her performance evaluation immediately after the complaint was the highest possible evaluation she could have received.  Plaintiff speculates that perhaps Elkins was unaware of her July 1997 EEO complaint when he performed her evaluation in March 1998.  However, this is inadmissible speculation on her part.  Elkins testified that he was, in fact, aware of the complaint at that time.  This assertion is uncontradicted by any competent evidence.

In February 1998, Erskine settled her EEO complaint by agreeing to be detailed to the day shift for on-the-job training.  [DEX 22, Settlement Agreement].  Prior to the start of this detail, Erskine was sent to Ft. Huachuca, Arizona, for training from March 23 to April 17, 1998, to learn how to use DMS.  Upon her return, until September 15, 1998, plaintiff worked in DMS.  From September 15, 1998, to the end of the rating period in March 1999, she resumed performing the duties she performed prior to the on-the-job training.

On March 2, 1999, plaintiff received an evaluation signed by Elkins on February 23, 1999, wherein Elkins rated plaintiff as "Successful, Level 2." Elkins testified that he rated her lower than her previous evaluation because of the difficulty she had with DMS, as well as problems she had gathering information for reports and doing the reports themselves. Elkins testified that the primary reason he rated Erskine lower in this evaluation was because of her problems handling the DMS program. [DEX 2 at 83-84]. Erskine does not dispute that she had a problem with the DMS program. However, she claims that it was because she had not received prerequisite training needed to perform that assignment, despite the four weeks training she received in Arizona. [*Id.* at 82]. Nevertheless, the record shows that this rating had no impact on her professional career.

> Administrative Law Judge: Have you applied for anything, have you sought any employment opportunities and was told that, Ms. Erskine, the reason you didn't get this opportunity was because you only received a Successful Level 2 on your March, 1999 performance appraisal?
>
> Erskine: No.

[DEX 3 at 166].[5]  Therefore, the lower evaluation does not form the basis for a Title VII cause of action. *See Davis*, 245 F.3d at 1243.

---

[5] Plaintiff submitted an affidavit with her brief wherein she states that, in her experience, a better evaluation results in more incentive pay, larger bonuses, and larger raises. To the extent that this conflicts with her earlier sworn testimony, it is due to be disregarded. *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984). In any event, she does not allege that she has suffered any damage; she simply speculates that it is possible. This is insufficient. *See Davis*, 245 F.3d at 1243 ("A negative evaluation . . . will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result.").

Furthermore, plaintiff has failed to rebut the legitimate, good faith reason set forth by defendant for plaintiff's lower evaluation. Plaintiff concedes that she had difficulty handling the DMS program and was late on at least one occasion in submitting a report. However, she blames these events on not having been given the needed prerequisite training and a lack of equipment to perform her job. [DEX 2 at 82; DEX 3 at 129-30]. Although she asserts that there were good reasons for her poor performance in certain areas, plaintiff has not provided any evidence to reflect that the complaints regarding her performance, outlined above, are false. Thus, she has failed to rebut defendant's stated reason for giving her the lower evaluation.

Likewise, there must be a causal link between the adverse personnel action and the protected action. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000). The lower evaluation was signed by Elkins on February 23, 1999, and received by plaintiff on March 2, 1999. The EEO complaint was filed in July 1997. Thus, at least 19 months had elapsed between the complaint and the lower evaluation. Further, in the interim, in March 1998, plaintiff received a "Successful, Level 1" evaluation.

In order to establish the requisite "causal link" required as part of a *prima facie* case, a plaintiff need only establish that "the protected activity and the adverse action were not wholly unrelated." *See EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981,

24

106 S.Ct. 385, 88 L.Ed.2d 338 (1985). A short period of time between the serving of an EEO complaint and the adverse employment action is circumstantial evidence of causation. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998). However, when the causal link is premised merely upon the employer's knowledge of the EEO complaint and the adverse job action, the temporal proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citing affirmatively several courts of appeals decisions for the proposition that a three- or four-month gap is insufficient to establish the causal relation prong in a retaliation case). *See also, Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999) (15-month gap too long). Therefore, because the temporal gap in this case is 19 months, plaintiff has failed to demonstrate that there is a sufficient temporal nexus between the EEO charge and the alleged discrimination.

## The 1999 Blacks in Government Conference

Plaintiff alleges that she was denied funding to attend the 1999 Blacks in Government conference as retaliation for her prior EEO complaints in July 1997 and June 1999. At the time plaintiff applied to go to the 1999 BIG conference, Elkins and Taylor believed that they were required to send someone. Because plaintiff had been to the conference before, they decided to send the Training Coordinator for all of CIC, Glenda Parker. Thereafter, Parker decided she did not want to go to the conference. Before Elkins and Taylor selected another person to attend the conference, they learned that they did not have to send someone to the

conference as they originally believed.  Therefore, because of funding shortages and the fact

that the conference was not mission-related, it was decided not to send *anyone* to the

conference.

Plaintiff has offered no evidence that any other non-protected employees were allowed

to go to this or any other non-mission-related conference during this time period or that this

stated explanation is otherwise pretextual.  Thus, plaintiff has failed to show that she was

treated less favorably than other non-protected employees and has failed to rebut this

legitimate, good faith reason for her non-selection.

**Newly Raised Claims**

Plaintiff's attempt to raise claims regarding her February 28, 2000, evaluation and her

denial of a promotion to a GS-11 position are not before the court because they have not been

exhausted in the manner required by law through pursuit of an administrative remedy.  *See*

*Brown v. General Services Administration*, 425 U.S. 820, 833, 96 S.Ct. 1961, 1968,

48 L.Ed.2d 402 (1976); *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 93-94, 111 S.Ct. 453,

456, 112 L.Ed.2d 435 (1990).  Therefore, these claims are not addressed here.


CONCLUSION

After a thorough review of the record submissions and the briefs of the parties, the

court can find no basis for relief for any of the claims brought by plaintiff.  With regard to

each, she has either failed to present a *prima facie* case of discrimination or has failed to

26

rebut defendant's asserted legitimate, good faith reason for its decision, or both.  Therefore,

defendant's motion for summary judgment is due to be granted.  A separate order in

conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ___2nd___ day of June, 2004.


HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

27